# In the United States Court of Federal Claims

No. 13-463C
(Filed Under Seal: June 23, 2014)
(Reissued for Publication: July 22, 2014)[*]

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| B&B MEDICAL SERVICES, INC., | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | * |
| THE UNITED STATES, | * |
| | * |
| Defendant, | * |
| | * |
| and | * |
| | * |
| ROTECH HEALTHCARE, INC., | * |
| | * |
| Defendant-Intervenor. | * |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## OPINION AND ORDER

Earlier this year, the United States Department of Veterans Affairs ("VA") awarded a contract for home oxygen services to defendant-intervenor Rotech Healthcare, Inc. ("Rotech"). Plaintiff B&B Medical Services, Inc. ("B&B") protested the VA's award decision, alleging errors in the VA's responsibility determination, past performance evaluation, and best value tradeoff. While the parties were engaged in briefing on cross-motions for judgment on the administrative record, the VA commenced corrective action and defendant moved to dismiss the protest as moot. For the reasons set forth below, the court grants defendant's motion.

## I. BACKGROUND

### A. The Solicitation

On May 31, 2013, the VA issued solicitation number VA256-12-R-0059 for the Veterans Integrated Service Network ("VISN") 16 Home Oxygen Services contract.[1] AR 129, 2908-09.

---

[*] This reissued Opinion and Order incorporates the agreed-to redaction proposed by the parties on July 18, 2014. The redaction is indicated with a bracketed ellipsis ("[. . .]").

[1] The court derives the facts in the background section from the administrative record ("AR") and the exhibit attached to defendant's motion to dismiss.

The contract work involved the furnishing of "all labor, supervision, equipment, training, supplies, delivery and maintenance and incidentals to provide an effective home oxygen services program" within VISN 16, an area that included ten VA medical centers serving 6,300 oxygen-using patients in nine southern and midwestern states.[2] Id. at 140-44. The VA anticipated awarding two contracts; work for two of the medical centers was set aside for a small business, while competition for the remaining work was unrestricted. Id. The contracts were to be awarded for one base year, with four one-year option periods. Id. at 140.

Offerors were to submit their proposals in three parts: a technical proposal, a volume containing past performance information for up to ten similar government or commercial contracts from the previous three years, and a price proposal. Id. at 232. They were also to submit a small business subcontracting plan. Id. at 235. The VA intended to evaluate the offerors' proposals on five factors: (1) technical capability, (2) quality control program, (3) past performance, (4) participation of service-disabled veteran-owned small businesses ("SDVOSB") and commitment to small businesses, and (5) price. Id. at 242. Upon evaluating all of the proposals on these factors, the VA would "award a contract . . . to the responsible offeror whose offer, conforming to the solicitation, [would] be most advantageous to the Government, price and other factors considered." Id. at 241.

## B. The Source Selection Plan

The exact procedures that the VA would use to evaluate proposals were not set forth in the solicitation. Rather, the procedures were outlined in the source selection plan that was approved by the contracting officer on May 28, 2012.[3] Id. at 99-108. First, the VA would determine the acceptability of the proposals, i.e., it would ascertain whether the offerors complied with the solicitation. Id. at 106. Second, a source evaluation team, also referred to as a technical evaluation board ("TEB"),[4] would evaluate the proposals under the technical factors.[5]

---

[2] The nine states are Louisiana, Texas, Oklahoma, Mississippi, Alabama, Florida, Arkansas, Missouri, and Kansas. AR 141-44.

[3] The body of the source selection plan departs from the plan's table of contents in significant respects. For example, the body of the plan does not contain sections describing how technical capability, SDVOSB participation, and price would be evaluated and rated, even though such sections appear in the table of contents. Indeed, it is difficult to ascertain whether certain sections were omitted intentionally or accidentally because the section numbering within the body of the plan–specifically within section 4–is inconsistent. For example, there is no section 4.0, and there is a section 4.2.2, but no section 4.2.1. Compare AR 100, with id. at 105-06.

[4] Compare AR 103 ("source evaluation team"), 106 ("SET"), with id. at 101 ("technical evaluation board"), 107 ("TEB").

[5] The source selection plan confusingly provides: [. . .]. AR 106 (emphasis added). The solicitation does not contain a section M, see id. at 131-32; past performance, SDVOSB

Id. Each evaluator was to identify and document the significant strengths, strengths, weaknesses, significant weaknesses, and deficiencies of each proposal and then assign a rating–Excellent, Good, Marginal, or Unsatisfactory–for each factor.[6] Id. at 104-06. Third, a past performance evaluation team would evaluate the proposals under the past performance factor and then assign an appropriate confidence rating.[7] Id. at 106-07. Fourth, the TEB would meet to discuss the evaluations and arrive at a consensus, after which the chair of the TEB would prepare a "Capability Assessment Memorandum (Consensus Evaluation Report)" summarizing the TEB's findings. Id. at 107. In particular, the report was to include [. . .]. Id. Additionally, the TEB was to [. . .]. Id.

Fifth, upon receipt of the TEB's report, the contracting officer could, if she chose to do so, [. . .] and then place these proposals in a best value pool. Id. Sixth, if a best value pool was established, the VA might conduct exchanges with the offerors and/or request proposal revisions. Id. at 107-08. Seventh, upon receipt of revised proposals, the TEB would conduct a final evaluation, and then the chair of the TEB would [. . .] Id. at 108. The final step of the process was the selection of the source:

[. . .]

Id.; see also id. at 101 ([. . .]). As described in the following section, the source selection process ultimately employed by the VA did not precisely conform to the source selection plan.

## C. Evaluation of Proposals

The VA received nine proposals by the August 13, 2012 proposal deadline. Id. at 1225-26, 1234. The contracting officer found [. . .]. See, e.g., id. at 1033-34. From August 26, 2012, through August 31, 2012, the TEB convened to evaluate the proposals. Id. at 1220.1. The TEB

---

participation, and price were not technical factors or subfactors in the solicitation, see id. at 232-35, 242-48; only the past performance evaluation team was to evaluate the proposals under the past performance factor, see id. at 106; and the TEB was not supposed to have access to price information, see id. at 104. However, because the TEB's actual evaluations reveal that it only evaluated the proposals under the technical capability and quality control program factors, see id. at 1161-220, the court presumes that that was the intent of the source selection plan.

[6] Although the body of the source selection plan indicates that the adjectival ratings to be used were [. . .], AR 105-06, the scoring sheets attached as exhibits to the source selection plan indicate that adjectival ratings of [. . .] should be used, id. at 118, 121. The TEB ultimately used the latter, not the former, ratings. See id. at 1161-220, 1227.

[7] In the source selection plan, only the abbreviation "PPET" is used, AR 106; the abbreviation is not defined, nor are the members of the past performance evaluation team identified. The earliest document containing the missing information is the contracting officer's January 2, 2013 best value pool determination. See id. at 1221-39.

members evaluated the proposals under the technical capability and quality control program factors, identifying the proposals' strengths and weaknesses and assigning appropriate ratings. See, e.g., id. at 1161-220.  And, it appears that the past performance evaluation team met and evaluated the proposals under the past performance factor.[8]  See id. at 1227; see also id. at 1110 (containing one page of handwritten notes regarding B&B's past performance), 1135 (containing one page of handwritten notes regarding Rotech's past performance).

The chair of the TEB sent the TEB's report to the contracting officer on December 12, 2012.  Id. at 1220.1-.8.  In the report, the TEB chair summarized the contents of each of the nine proposals with respect to the technical capability and quality control program factors.  Id. However, contrary to the process set forth in the source selection plan, the report did not include an analysis of each proposal's strengths and weaknesses.  Rather, the TEB chair merely noted what the offerors included in their proposals, what the offerors did not include in their proposals, and, in some cases, the quality of what the offerors included in their proposals.  Id.

Also contrary to the source selection plan, the TEB's report lacked a recommendation of the highest rated technical proposal.  Indeed, although the chair of the TEB wrote that the TEB identified three offerors who could perform the contract and who should be considered for award, id. at 1220.1, he did not name those offerors in the report.  Nor did he include the TEB's consensus adjectival ratings for the proposals under the technical capability and quality control program factors.

On January 2, 2013, the contracting officer issued her best value pool determination.  Id. at 1221-39.  Based on the contents of the document, the contracting officer considered the following information:  the TEB's report; other information provided by the TEB but not included in the administrative record, such as the TEB's consensus ratings; the evaluations of the past performance evaluation team, which also were not included in the administrative record; and her evaluations of the SDVOSB/small business and price factors.  Id.  In section IV(c) of the document, she reproduced the summaries of the contents of the nine proposals from the TEB's report,[9] provided summaries of how each proposal fared under the past performance factor,

---

[8]  There is no contemporaneous documentation, such as evaluation forms or a report, of the past performance evaluation team's meeting.  The first indication that the team met appears in the contracting officer's January 2, 2013 best value pool determination.  See AR 1221-39; cf. id. at 1110 (containing an undated page of handwritten notes regarding B&B's past performance), 1135 (containing an undated page of handwritten notes regarding Rotech's past performance).  It also bears noting that according to the best value pool determination, the past performance evaluation team evaluated past performance using adjectival ratings not previously defined in the solicitation or source selection plan:  Exceptional, Very Good, Satisfactory, Neutral, Marginal, and Unsatisfactory.  Id. at 1228.  It is unclear how these adjectival ratings were translated into the confidence ratings ultimately assigned by the contracting officer.  See id. at 1235-37; see also id. at 246 (containing the source selection plan's description of the five available confidence ratings).

[9]  The court did not compare the TEB's report with the best value pool determination

summarized her findings under the SDVOSB/small business factor, and discussed the price factor. Id. at 1228-39.  She ultimately concluded that there should be a best value pool consisting of the proposals from three offerors:  B&B, Rotech, and [. . .].  Id. at 1238.  The contracting officer decided to conduct exchanges with these three offerors and then provide them with the opportunity to submit revised proposals.  Id. at 1239.

The contracting officer advised the offerors that their proposals were part of the best value pool on January 10, 2013.  Id. at 1240, 1245.  Attached to her notification letters were questions that the offerors needed to address in writing and during oral presentations scheduled for January 23, 2013.  Id. at 1240-49.  During the two days following the oral presentations, members of the TEB reevaluated the proposals, presumably in light of what they learned during the exchanges.  Id. at 2747-813.4.  Then, on January 25, 2013, the contracting officer advised the offerors of the remaining weaknesses with their proposals and invited the submission of revised proposals by February 4, 2013.  Id. at 1271-73.

### D.  Evaluation of Revised Proposals

Rotech submitted its revised proposal on February 1, 2013, id. at 2746.3, and B&B submitted its revised proposal on February 4, 2013, id. at 2746.2.  Although the source selection plan indicated that the TEB would evaluate the revised proposals and the chair of the TEB would modify the TEB's report in accordance with its final evaluations, the administrative record does not contain any evaluation forms, notes from TEB members, or a TEB report postdating the receipt of final proposals.  However, in her February 12, 2013 source selection decision document, the contracting officer asserted that the TEB convened on February 6, 2013, to "review" the revised proposals.  Id. at 2925.

### E.  The Responsibility Determination

On February 4, 2013, the same date that the proposal revisions were due, the contracting officer prepared a responsibility determination for Rotech.[10]  Id. at 2836-38.  In that document, she concluded:

> Based on the above, Rotech Healthcare Inc. has been determined to be a responsible contractor, in accordance with [Federal Acquisition Regulation ("FAR")] Subpart 9.1, for performance under Contract No. VA260-P-0891 [sic], I hereby determine that award be made to Rotech Healthcare Inc. in the amount of $68,300,732.76 for the . . . base period of April 1, 2013 to March 31, 2014 with

---

word for word, but an examination of the two documents seems to indicate that the contracting officer copied and pasted the summaries prepared by the TEB chair.

[10]  The administrative record lacks any evidence that the contracting officer prepared responsibility determinations for the other two offerors in the best value pool.

> four (4) twelve (12) month option periods, said contract price being fair and
> reasonable and in the best interest of the U.S. Government.

Id. at 2838.  In other words, two days before the TEB evaluated the revised proposals and eight
days before she signed and issued the source selection decision document, the contracting officer
decided to award the contract to Rotech.

## F.  Selecting a Source

As noted above, the contracting officer issued the source selection decision document on
February 12, 2013.  Id. at 2908-33.  In section IV(c) of the document, the contracting officer
provided a summary of the initial evaluations of the three proposals in the best value pool.
Instead of reproducing what she included in her best value pool determination, however, she
provided amended and expanded versions of the technical capability, quality control program,
and past performance factor summaries.[11]  For example, in the summaries pertaining to the
technical capability and quality control program factors, she provided additional details and
specifically identified strengths and weaknesses.  Id. at 2918-24.  And, in the summaries
pertaining to the past performance factor, she provided significantly more detailed information
regarding the offerors' past performance.  Id. at 2920-24.

After describing the initial evaluation of proposals in the best value pool, the contracting
officer summarized what occurred during the exchanges–both the questions that the VA had for
the offerors and the offerors' responses.  Id. at 2925-28.  She also set forth revised ratings for
each offeror's proposal and the prices contained in the revised proposals.  Id. at 2928-29.
However, the contracting officer did not indicate whether her summaries or the revised ratings
were derived from the TEB's consensus after evaluating the revised proposals or reflected her
independent judgment.

Section IV of the source selection decision document concluded with the contracting
officer's tradeoff analysis.  Id. at 2930-32.  The contracting officer concluded this analysis by
recommending that Rotech be awarded the VISN 16 Home Oxygen Services contract.  Id. at
2932.  The contract was, in fact, awarded to Rotech on March 9, 2013, id. at 2934, with
performance to begin on April 1, 2013, id. at 2937.

## G.  Postaward Proceedings

After obtaining a written debriefing from the contracting officer on March 13, 2013, id. at
3056-57, B&B lodged a protest with the United States Government Accountability Office

---

[11]  Because the additional information included in these summaries was not derived from
the TEB's report or any formal documentation from the past performance evaluation team, the
court presumes that the contracting officer added it as she was preparing her source selection
decision document.  It is unclear why the contracting officer would retroactively add information
related to the initial evaluation of proposals.

("GAO") on March 18, 2013, id. at 3060-89, and a supplemental protest with the GAO on March 25, 2013, id. at 3090-145.  During the GAO proceedings, the contracting officer submitted a statement of facts dated April 17, 2013, id. at 3710-17, as well as an undated supplemental statement of facts, id. at 3930-31.  The latter fact statement contains the following explanation regarding how proposals were evaluated under the past performance factor (all errors are the contracting officer's): [12]

> [T]he Contracting Officer convened the TEB on August 27-31, 2012 in Jackson, MS. . . .  Due to the fact the Contracting Officer was on-site to conduct the on-site evaluation, the Contracting Officer was able to meet with the members of the Past Performance Evaluation Team (PPET) Offeror to provide instruction on the procedures for conducting the past performance evaluations.  Explanation for the adjectival assessment in the solicitation and to answer questions the PPET may have in their role in the evaluation.  The PPET was provided with the past performance information provided by each Offeror as part of their proposal and questionnaire submittals, along with the criteria outlined in the solicitation Instruction to Offeror Section and Solicitation Evaluation Factor Section.  The PPET reviewed the documents provided and then each Offeror was discussed with the Contracting Officer and notes on a hotel note pad were taken by one member of the PPET.  At the conclusion of this meeting the PPET had made a determination of ratings for Past Performance for each Offeror. . . .  Upon returning from the on-site evaluation the Contracting Officer prepared the Contracting Office's Best Value Decision (Source Selection) document which contains the Past Performance ratings which were determined by the PPET while the Contracting Officer was on-site with the PPET . . . .[13]

---

[12]  The court generally does not consider statements prepared by the contracting officer in response to a bid protest if those statements constitute after-the-fact explanations of the basis of the contracting officer's decision-making process.  See Jacobs Tech. Inc. v. United States, 100 Fed. Cl. 198, 208 (2011).  The information quoted by the court does not constitute such an explanation.

[13]  The contracting officer did not issue her source selection decision until February 12, 2013, AR 2908-33, almost six months after she met with the past performance evaluation team.  The court presumes that the contracting officer meant to refer to her January 2, 2013 best value pool determination, which is the earliest-dated document that includes formal past performance factor evaluations.  See id. at 1221-39.  It is unclear from her statement whether the contracting officer immediately drafted the summaries of the past performance evaluations upon her return to her office after the on-site meeting, or whether she drafted the summaries just prior to issuing her best value pool determination on January 2, 2013.  The court would be troubled if it was the latter, as the administrative record lacks notes or other contemporaneous documentation reflecting the past performance evaluation team's consensus evaluations and ratings from which the contracting officer could refresh her recollection.  (The handwritten notes by one of the team members bear no indication that they represent the team's consensus evaluations; nor do they reflect a confidence rating.  Id. at 1110, 1135.)  Further, regardless of when the contracting

Id. at 3930-31 (footnote added).  The GAO dismissed some of B&B's arguments on April 12, 2013, id. at 3422, and the remainder of its arguments on June 24, 2013, id. at 4017-27.

B&B filed the present protest on July 9, 2013.  In its amended complaint, it alleges a number of errors in the VA's responsibility determination, past performance evaluation, and best value tradeoff.  It therefore seeks (1) a declaration that the VA improperly conducted the procurement, evaluated the proposals, and awarded the contract to Rotech; (2) a declaration that the VA's responsibility determination was improper; (3) an injunction directing the VA to terminate the award to Rotech; (4) an injunction directing the VA to either award it the contract or to conduct a new competition; (5) injunctions directing the VA to conduct a new responsibility determination, past performance evaluation, and best value evaluation; and (6) other necessary, just, and proper relief, including bid preparation and proposal costs.  Rotech intervened and the court conducted an initial status conference, during which defendant represented that the VA had agreed to stay Rotech's performance of the VISN 16 Home Oxygen Services contract for all but one of the affected hospitals.

Pursuant to a scheduling order entered by the court after the status conference, the parties began to brief cross-motions for judgment on the administrative record.  After reviewing the parties' opening briefs, the court issued an order identifying additional issues not addressed by the parties and modifying the remaining briefing schedule to allow the parties to address those issues.  One week later, defendant filed a notice indicating that the VA "intend[ed] to take corrective action . . . by re-conducting its source selection decision among the three offers in the Best Value Pool, including with respect to the agency's consensus evaluations and responsibility determination."  Notice, Sept. 13, 2013, at 1.  Defendant further stated that once the VA commenced its corrective action, it would move to dismiss the protest as moot.  The court suspended the remaining briefing, and on September 23, 2013, defendant filed a motion to dismiss, indicating that the VA had commenced corrective action on September 17, 2013.  Specifically, in a letter attached as an exhibit to defendant's motion, the contracting officer indicated:

> [The VA] intends to take corrective action . . . .  The corrective action to be taken will involve re-conducting the source selection decision among the three Offerors in the Best Value Pool. . . .
>
> This corrective action source selection decision will be based on the initial proposal submissions dated July 2012, the written submissions and discussions held in January 2013, and the revised proposals submitted in February 2013.

---

officer prepared the summaries, the record lacks any documentation of the past performance evaluation team's consensus evaluations and confidence ratings, leading the court to presume that the contracting officer relied upon her memory when drafting the summaries.

Mot. Attach. A.  The parties have fully briefed defendant's motion, and, deeming oral argument unnecessary, the court is prepared to rule.

## II.  DISCUSSION

### A.  Defendant's Motion to Dismiss

Defendant raises its mootness argument in a motion to dismiss B&B's protest for lack of jurisdiction pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC").  "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome."  Powell v. McCormack, 395 U.S. 486, 496 (1969).  When a case is moot, there are no justiciable issues upon which the court can render a decision.[14]  Flast v. Cohen, 392 U.S. 83, 95 (1968); see also Fisher v. United States, 402 F.3d 1167, 1176 (Fed. Cir. 2005) (panel portion) (noting that justiciability "encompasses a number of doctrines under which courts will decline to hear and decide a cause," including the "doctrines of standing, mootness, ripeness, and political question").  The court's inquiry into the justiciability of a case is distinct from its inquiry into whether it has jurisdiction over the case's subject matter.  Powell, 395 U.S. at 512; Baker v. Carr, 369 U.S. 186, 198 (1962); Prasco, LLC v. Medicis Pharm. Corp., 537 F.3d 1329, 1335 n.3 (Fed. Cir. 2008); Murphy v. United States, 993 F.2d 871, 872 (Fed. Cir. 1993).  In other words, the court may find that it possesses jurisdiction over the subject matter of a case but that the dispute is nevertheless nonjusticiable.  Thus, while mootness is jurisdictional

---

[14]  The "lack of jurisdiction to review moot cases derives from the requirement of Article III of the Constitution under which the exercise of judicial power depends upon the existence of a case or controversy."  Liner v. Jafco, Inc., 375 U.S. 301, 306 n.3 (1964); see also U.S. Const. art. III, § 2 ("The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties . . . [and] to Controversies to which the United States shall be a Party . . . .").  But see Honig v. Doe, 484 U.S. 305, 329-32 (1988) (Rehnquist, C.J., concurring) (questioning the constitutional origins of the mootness doctrine by arguing that despite federal courts' recognition of exceptions to mootness, such exceptions cannot be read into Article III's "case or controversy" requirement); Matthew I. Hall, The Partially Prudential Doctrine of Mootness, 77 Geo. Wash. L. Rev. 562, 575 (2009) (arguing "that if the mootness bar were truly a mandatory, jurisdictional rule imposed by the Constitution, then the exceptions . . . could not exist").  The United States Court of Federal Claims ("Court of Federal Claims"), as a court established under Article I of the United States Constitution, 28 U.S.C. § 171(a) (2012), is not bound by the "case or controversy" requirement of Article III, Zevalkink v. Brown, 102 F.3d 1236, 1243 (Fed. Cir. 1996).  Nevertheless, the Court of Federal Claims and other Article I courts traditionally have applied the "case or controversy" justiciability doctrines.  See id.; Anderson v. United States, 344 F.3d 1343, 1350 n.1 (Fed. Cir. 2003); CW Gov't Travel, Inc. v. United States, 46 Fed. Cl. 554, 558 (2000); cf. 28 U.S.C. § 2519 (using the phrase "case or controversy" in describing the finality of judgments of the Court of Federal Claims).

in that it involves the court's power to adjudicate a case,[15] an RCFC 12(b)(1) motion may not be the appropriate vehicle by which to dismiss a case as moot.[16]

Regardless of whether a moot claim should be dismissed for lack of subject matter jurisdiction or for failure to state a claim upon which the court could grant relief, the standard applied by the court in reviewing a motion urging dismissal of a claim as moot is the same:  the court assumes that the allegations in the complaint are true and construes those allegations in the plaintiff's favor.  Henke v. United States, 60 F.3d 795, 797 (Fed. Cir. 1995).

## B.  Mootness

A court "will determine only actual matters in controversy essential to the decision of the particular case before it."  United States v. Alaska S.S. Co., 253 U.S. 113, 115 (1920).  "The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests."  Aetna Life Ins. Co. of Hartford, Conn. v. Haworth, 300 U.S. 227, 240-41 (1937).  Moreover, the controversy must exist at all stages of the litigation; it is not enough that the controversy was alive when the complaint was filed.  Steffel v. Thompson, 415 U.S. 452, 459 n.10 (1974).  Subsequent acts will render a case moot if they make it impossible for the court to grant "'effectual relief.'"  Church of Scientology of Cal. v. United States, 506 U.S. 9, 12 (1992) (quoting Mills v. Green, 159 U.S. 651, 653 (1895)).  However, a case will not be rendered moot

---

[15]  See, e.g., Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 102-10 (1988) (characterizing the justiciability issue of standing as a jurisdictional issue); North Carolina v. Rice, 404 U.S. 244, 246 (1971) (per curiam) ("Mootness is a jurisdictional question because the Court is not empowered to decide moot questions or abstract propositions . . . ." (internal quotation marks omitted)); Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1369 (Fed. Cir. 2002) ("[M]ootness . . . is a threshold jurisdictional issue."); CBY Design Builders v. United States, 105 Fed. Cl. 303, 328 (2012) ("The mootness of a case is properly the subject of an RCFC 12(b)(1) motion.").

[16]  See, e.g., Baker, 369 U.S. at 196 (holding that a case that is "unsuited to judicial inquiry or adjustment" should be dismissed for "a failure to state a justiciable cause of action" and not for "a lack of jurisdiction of the subject matter" (internal quotation marks omitted)); Oryszak v. Sullivan, 576 F.3d 522, 526-27 (D.C. Cir. 2009) (Ginsburg, J., concurring) (noting that when "a plaintiff makes a claim that is not justiciable . . . a court should dismiss the case for failure to state a claim" and that "it is important to distinguish among failure to state a claim, a claim that is not justiciable, and a claim over which the court lacks subject matter jurisdiction"); F. Alderete Gen. Contractors, Inc. v. United States, 715 F.2d 1476, 1480 (Fed. Cir. 1983) (reciting "the long-standing rule in the Federal courts that jurisdiction is determined at the time the suit is filed and, after vesting, cannot be ousted by subsequent events, including action by the parties" (emphasis added)); see also Kontrick v. Ryan, 540 U.S. 443, 455 (2004) ("Clarity would be facilitated if courts and litigants used the label 'jurisdictional' . . . only for prescriptions delineating the classes of cases (subject-matter jurisdiction) and the persons (personal jurisdiction) falling within a court's adjudicatory authority.").

by subsequent acts if some of the requested relief remains available. <u>Intrepid v. Pollock</u>, 907 F.2d 1125, 1131 (Fed. Cir. 1990); <u>accord</u> <u>Church of Scientology of Cal.</u>, 506 U.S. at 12 (holding that a case is not moot so long as the "court can fashion <u>some</u> form of meaningful relief" for the injured party).

In this protest, the subsequent act invoked by defendant is the VA's decision to take corrective action. "A defendant's voluntary cessation of allegedly unlawful conduct ordinarily does not suffice to moot a case." <u>Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.</u>, 528 U.S. 167, 174 (2000). However, the voluntary cessation of the challenged activity may render a case moot if there is no reasonable expectation that the activity will recur and the effects of the activity have been completely extinguished. <u>Cnty. of L.A. v. Davis</u>, 440 U.S. 625, 631 (1979). Thus, when "corrective action adequately addresse[s] the effects of the challenged action, and the Court of Federal Claims ha[s] no reasonable expectation that the action would recur," the case should be dismissed. <u>Chapman Law Firm v. Greenleaf Constr. Co.</u>, 490 F.3d 934, 940 (Fed. Cir. 2007). The party asserting mootness bears a heavy burden of establishing that the challenged activity will not recur. <u>Friends of the Earth, Inc.</u>, 528 U.S. at 189.

## C. B&B's Protest Is Moot

Defendant contends that B&B's protest is now moot because the corrective action initiated by the VA–reconducting the source selection decision among B&B, Rotech, and [. . .]– would entail revisiting all of the decisions that B&B challenged in its protest, i.e., the VA's responsibility determination, past performance evaluation, and best value tradeoff. B&B disagrees, asserting that there was no evidence that the VA, in taking the proposed corrective action described in the contracting officer's letter, would "set aside or terminate the award made to Rotech, discuss the consensus evaluations, or . . . take corrective action with respect to the defective responsibility determination or the flawed past performance evaluations." Resp. 4. More particularly, B&B avers that the VA has left the award to Rotech in place and allowed Rotech to proceed with performing the contracted-for services at the one hospital where contract performance had not been stayed. And, B&B states, defendant is incorrect to assert that the VA's responsibility determination or past performance evaluations were components of the source selection decision that the VA intended to conduct anew. In its reply brief, defendant reiterates that the VA's corrective action would include a new responsibility determination, new consensus evaluations, and new past performance evaluations, as reflected in its September 2013 notice and its motion to dismiss. It further contends that Rotech's continued performance at the one hospital where contract performance was not stayed is irrelevant for two reasons: (1) the VA's corrective action reopens the competition to provide services at the hospital to B&B, foreclosing the court's ability to grant B&B effectual relief; and (2) B&B was not the incumbent contractor at the hospital and accordingly never had the right to perform work there.

The only evidence of the scope of the corrective action being taken by the VA is the contracting officer's letter that defendant attached to its motion to dismiss, which indicates that the VA would reconduct the source selection decision among B&B, Rotech, and [. . .] based on the initial proposals, discussions, and revised proposals. Specific reference to new consensus evaluations, new past performance evaluations, and a new responsibility determination appears

only in defendant's notice, motion to dismiss, and reply brief.  Although the court has no reason to doubt the representations made by defendant in these filings, it cannot accept such representations as fact.  See Del., Lackawanna & W. R.R. Co. v. United States, 54 Ct. Cl. 35, 41-42 (1919) ("The court can not accept asseverations of counsel, as to facts, made in argument, whether denied or conceded by the other side at the bar, without any stipulation duly filed or other evidence . . . .").  Thus, the court's analysis is limited to whether the contents of the contracting officer's letter are sufficient to satisfy defendant's burden to establish that the VA's corrective action moots this protest.

The contracting officer states in her letter that the VA's corrective action would involve reconducting the source selection decision and that the decision would be based on initial proposals, discussions, and revised proposals.  Logically, this process must involve more than just the contracting officer rewriting her source selection decision document; if the TEB and the past performance evaluation team did not redo their evaluations, then the contracting officer would have no need to write a new decision.  It makes more sense that the VA would re-evaluate the proposals according to the procedures described in the source selection plan.  Although the source selection plan has numerous omissions and deficiencies, it can be reasonably interpreted to provide for, among other things, (1) an evaluation of the technical and quality control program factors by the TEB, (2) an evaluation of the past performance factor by the past performance evaluation team, (3) the convening of a TEB consensus meeting, (4) the preparation of a consensus evaluation report, and (5) a best value tradeoff by the contracting officer.  Accordingly, B&B's argument that the VA, in reconducting the source selection decision, would not conduct new consensus evaluations or past performance evaluations is without merit.

More persuasive are B&B's contentions regarding the need to conduct a new responsibility determination.  In the solicitation, the VA clearly indicated that the contract award would be made to a responsible offeror.  Thus, the source selection decision process necessarily entails a determination that the successful offeror was responsible.  Problematic in this case is that the VA has not terminated its contract with Rotech.  Accordingly, if the contracting officer determined, at the conclusion of the new source selection decision process, that Rotech would provide the best value to the VA, there is already an existing determination that Rotech is responsible.  The contracting officer's letter contains no indication that she would conduct a new responsibility determination for Rotech.  Indeed, FAR subpart 9.1 reflects that responsibility determinations are for prospective contractors, see generally FAR 9.100, and Rotech is the awardee presently performing under the contract based on a currently valid responsibility determination.  Thus, the contracting officer would not be legally required to redo her responsibility determination upon a finding that Rotech provided the best value to the VA.[17]

Nevertheless, there is no meaningful relief that the court could award to B&B in these circumstances.  To be sure, B&B requests an injunction directing the VA to set aside the contract

---

[17]  Nevertheless, given the concerns expressed by the court in its September 16, 2013 order, it would be foolhardy for the contracting officer to forgo preparing a new responsibility determination if she concluded that Rotech's proposal represented the best value for the VA.

award to Rotech and conduct a new responsibility determination.  However, even if the court issued such an injunction, it would have no practical effect because it would lead to a new competition, something that is already occurring by virtue of the VA reconducting the source selection decision.  B&B is among those offerors eligible to be awarded the contract in the new source selection decision process, and the court's granting of B&B's requested relief (resulting in the contract award being set aside and a new responsibility determination being conducted) would not give B&B any greater relief than the VA's corrective action has already provided.[18] In the absence of available meaningful relief, the court cannot proceed.  Defendant has met its burden to establish that the VA's corrective action renders B&B's protest moot.

### III.  CONCLUSION

For the foregoing reasons, the court **GRANTS** defendant's motion to dismiss and **DISMISSES** B&B's protest as **MOOT**.  No costs.  The clerk shall enter judgment accordingly.

Should B&B lodge another protest in this court in conjunction with the solicitation at issue here, the clerk shall waive the court's filing fee and assign the protest to the undersigned.

The court has filed this ruling under seal.  The parties shall confer to determine agreed-to proposed redactions.  Then, by **no later than Friday, July 11, 2014**, the parties shall file a joint status report indicating their agreement with the proposed redactions, **attaching a copy of those pages of the court's ruling containing proposed redactions, with all proposed redactions clearly indicated.**

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge

---

[18]  Although B&B requests an injunction directing the VA to award it the contract, it is well settled that in the event a court determines that the procurement was illegally conducted, the protestor has no right to be awarded the contract.  Parcel 49C Ltd. P'Ship v. United States, 31 F.3d 1147, 1152 (Fed. Cir. 1994) (discussing CACI, Inc.-Federal v. United States, 719 F.2d 1567, 1572-75 (Fed. Cir. 1983), and Scanwell Laboratories, Inc. v. Shaffer, 424 F.2d 859, 864 (D.C. Cir. 1970)).  Further, B&B's request for bid preparation and proposal costs is not yet ripe because B&B remains in the competition for the contract and may be awarded the contract.